

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO
CIVIL DIVISION

| | | |
|---|---|---|
| **BILLY & SHELLY WOLSING**<br>3940 Wynnbrook Dr. Apt 38<br>Florence, KY 41042 | : | Case No.<br><br>A 1 5 0 6 6 9 3 |
| **Plaintiff,** | : | Judge: |
| **v.** | : | **COMPLAINT & JURY DEMAND** |
| **ABUBAKAR ATIQ DURRANI, M.D.,**<br>**(Pakistan)**<br>(Serve via Hague) | : | |

D112852624 INI

And

**CENTER FOR ADVANCED SPINE
TECHNOLOGIES, INC.**
(Served by Hague Convention)

**(ALL NEW DR. DURRANI
CASES SHALL GO TO
JUDGE RUEHLMAN PER
HIS ORDER)**

And

**WEST CHESTER HOSPITAL, LLC**
7700 UNIVERSITY DRIVE
WEST CHESTER, OH 45069

SERVE: GH&R BUSINESS SVCS., INC.
511 WALNUT STREET
1900 FIFTH THIRD CENTER
CINCINNATI, OH 45202
(Serve via Certified mail)

**REGULAR MAIL WAIVER**

FILED

And

**UC HEALTH**
SERVE: GH&R BUSINESS SVCS., INC.
511 WALNUT STREET
1900 FIFTH THIRD CENTER
CINCINNATI,OH 45202
(Serve via Certified mail)

**REGULAR MAIL WAIVER**

**Defendants.**

1

EXHIBIT A

Come now Plaintiffs, Billy and Shelly Wolsing, and file this Complaint and jury demand, pursuant to the agreement of the parties and Order of the Court, and state as follows:

1.     At all times relevant, Plaintiffs were residents of and domiciled in the State of Kentucky.

2.     At all times relevant, Defendant Dr. Abubakar Atiq Durrani (hereinafter "Dr. Durrani") was licensed to and did in fact practice medicine in the State of Ohio.

3.     At all times relevant, Center for Advanced Spine Technologies, Inc. (hereinafter "CAST"), was licensed to and did in fact perform medical services in the State of Ohio, and was and is a corporation authorized to transact business in the State of Ohio and Kentucky.

4.     At all times relevant, West Chester Hospital, LLC (hereinafter "West Chester Hospital"), was a limited liability company authorized to transact business and perform medical services in the State of Ohio and operate under the trade name West Chester Hospital.

5.     At all times relevant, Defendant UC Health Inc., was a duly licensed corporation which owned, operated and/or managed multiple hospitals including, but not limited to West Chester Hospital, and which shared certain services, profits, and liabilities of hospitals including West Chester.

6.     At all times relevant herein, West Chester Medical Center, Inc., aka West Chester Hospital held itself out to the public, and specifically to Plaintiffs, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through

2

its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

7.    UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC.

8.    UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC.

9.    UC Health Stored BMP-2 at UC Health Business Center warehouse located in Hamilton County.

10.    UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC. UC Health is located in Hamilton County making Hamilton County appropriate to bring this lawsuit.

11.  The subject matter of the Complaint arises out of medical treatment by Defendants in Hamilton County, Ohio.

12.  The amount in controversy exceeds the jurisdictional threshold of this Court.

13.  This case has been previously dismissed pursuant to Civ. R. 41(A)(1)(a) and is now being refiled within the time allowed by O.R.C. 2305.19.

## FACTUAL ALLEGATIONS OF PLAINTIFF

14.    In November of 2011, Plaintiff visited Dr. Durrani for moderate back pain that he had been experiencing since he was a child.

15.    Dr. Durrani recommended surgery the first visit and told Plaintiff he had bone spurs pushing on his nerves.

16.    On or about April 4, 2012 Dr. Durrani performed a lumbar hemilaminectomy and foraminotomy at West Chester Hospital.

3

17.     In September 2012, Dr. Durrani recommended Plaintiff undergo a second surgery.

18.     Plaintiff was forced to take five months off of his job and has been in constant pain since the surgery.

19.     Insurance was denied for the second surgery.

20.     Upon information and belief, the surgery at West Chester upon Mr. Wolsing by Dr. Durrani was medically unnecessary.

21.     As a direct and proximate result of this surgery and Dr. Durrani's negligence, the Plaintiffs have suffered harm.

22.     Plaintiffs did not become aware of Dr. Durrani's use of Infuse/BMP-2 until legal counsel reviewed Plaintiffs' bills.

## MORE SPECIFIC ALLEGATIONS BASED UPON DISCOVERY AND DEPOSITION TESTIMONY

23.     This information is to demonstrate the overall negligence and inappropriate actions of Dr. Durrani and the hospitals he worked with and/or for and/or in an individual capacity.

24.     Krissy Probst was Dr. Durrani's professional and personal assistant handling professional, academic, travel, surgery scheduling, his journals, his Boards, his credentialing, his personal affairs and his bills.

25.     Krissy Probst worked as Dr. Durrani's assistant for three years at Children's Hospital from 2006, 2007, and 2008.

26.     Krissy Probst reported Dr. Durrani to Sandy Singleton, the Business Director at Children's for his having an affair with Jamie Moor, his physician assistant.

4

27.    Krissy Probst resigned in 2008 from Dr. Durrani and remained working for three other surgeons in the Orthopedic Department.

28.    Krissy Probst worked in the Orthopedic Department for eleven years from 2002-2013.  She retired in May, 2013.

29.    Krissy Probst confirmed Dr. Durrani claims being a Prince, when he is not.

30.    According to Krissy Probst, Dr. Crawford, an icon in pediatric orthopedics treated Dr. Durrani "like a son."

31.    According to Krissy Probst, Dr. Crawford, Chief of Orthopedics at Children's unconditionally supported Dr. Durrani no matter the issues and problems Dr. Durrani faced.

32.    Dr. Durrani's patient care at Children's Hospital dropped off considerably after Jamie Moor became his physician assistant and they began their affair.

33.    Dr. Durrani was the only orthopedic spine surgeon at Children's who would perform a dangerous high volume of surgeries.

34.    At Children's, Dr. Durrani would begin a surgery, leave and have fellows and residents complete a surgery or do the full surgery while he was in his office with Jamie Moor, his physician assistant for four or five hours.

35.    Children's Board and administration knew about Dr. Durrani doing too many surgeries and not properly doing the surgeries.  They did nothing.

36.    Dr. Durrani argued to Children's administration when they complained to him that he made them money so Children's tolerated him and allowed him to do what he wanted.

5

37.   Dr. Durrani, when told by Children's that Jamie Moor had to leave, told Children's that he would leave too.

38.   Dr. Agabagi would do one spine patient a day at Children's because it takes normally eight hours for a full fusion.

39.   Dr. Durrani would schedule two to three spine surgeries a day at Children's.

40.   Dr. Durrani would repeatedly have the Business Director, Sandy Singleton, or OR Director allow him to add surgeries claiming they were emergencies when they were not.

41.   Dr. Durrani would leave a spine surgery patient for four or five hours in the surgery suite under the care of fellows or residents, unsupervised and sit in his office and check on the surgery as he pleased.

42.   Dr. Peter Stern did not like Dr. Durrani while Dr. Durrani was at Children's because he knew all about his patient safety risk issues. Yet, Dr. Stern supported, aided and abetted Dr. Durrani's arrival at West Chester. It defies comprehension, but was for one of the world's oldest motives—greed of money.

43.   There is also a Dr. Peter Sturm, an orthopedic at Children's who also had no use for Dr. Durrani.

44.   Dr. Durrani chose his own codes for Children's billing which he manipulated with the full knowledge of Children's Board and management.

45.   Dr. Durrani was dating and living with Beth Garrett, a nursing school drop-out, with the full knowledge of his wife Shazia.

46.   Dr. Durrani was close with David Rattigan until David Rattigan pursued Jamie Moor and Dr. Durrani would not allow David Rattigan in the OR at Children's for a long time.

6

47.     Dr. Durrani, while claiming to have riches, does not. Dr. Durrani's wife's family paid for Dr. Durrani's education and it is her family with the significant wealth.

48.     Medtronics paid for Dr. Durrani's trips and paid him $10,000 fees for speaking or simply showing up at a spine conference.

49.     Krissy Probst's business director told her to save all Dr. Durrani related documents and information and she did.

50.     While doing research at Children's, Dr. Durrani would misstate facts regarding his research. Children's knew he did this.

51.     Dr. Durrani ended on such bad terms with Children's Hospital he was not allowed on the premises after his departure in December 2008, yet he performed a spine surgery there in February 2009.

52.     Eric J. Wall, MD was the Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

53.     Sandy Singleton, MBA was the Senior Business Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

54.     On information and belief, Dr. Durrani used his relationships with Children's officials to purge his Children's file of all patient safety and legal issues which had occurred as part of his departure "deal" which Defendants hide with privilege.

### DR. DURRANI COUNTS:

### COUNT I: NEGLIGENCE

55.     Defendant Dr. Durrani owed his patient, Plaintiff, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

56.     Defendant Dr. Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, and improper follow-up care addressing a patient's concerns.

57.     As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of the Defendant Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT II: BATTERY

58.     Dr. Durrani committed battery against Plaintiff by performing a surgery that was unnecessary, contraindicated for Plaintiff's medical condition, and for which he did not properly obtain informed consent, inter alia, by using BMP-2, PureGen and/or Baxano in ways and for surgeries not approved by the FDA and medical community, and by the failure to provide this information to Plaintiff.

59.     Plaintiff would not have agreed to the surgeries if they knew the surgery(ies) was/were unnecessary, not approved by the FDA, and not indicated.

60.     As a direct and proximate result of the aforementioned battery by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: LACK OF INFORMED CONSENT

61.     The informed consent forms from Dr. Durrani and CAST which they required Plaintiff to sign failed to fully cover all the information necessary and required for the

8

procedures and surgical procedures performed by Dr. Durrani. Dr. Durrani and CAST each required an informed consent release.

62.     In addition, no one verbally informed Plaintiff of the information and risks required for informed consent at the time of or before Plaintiff's surgery.

63.     Dr. Durrani failed to inform Plaintiff of material risks and dangers inherent or potentially involved with their surgery and procedures.

64.     Had Plaintiff been appropriately informed of the need or lack of need for surgery and other procedures and the risks of the procedures, Plaintiff would not have undergone the surgery or procedures.

65.     As a direct and proximate result of the lack of informed consent, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

66.     Dr. Durrani's conduct as described above was intentional and reckless.

67.     It is outrageous and offends against the generally accepted standards of morality.

68.     It was the proximate and actual cause of Plaintiff's psychological injuries, emotional injuries, mental anguish, suffering, and distress.

69.     Plaintiff suffered severe distress and anguish so serious and of a nature that no reasonable man or woman would be expected to endure.

## COUNT V: FRAUD

70.     Dr. Durrani made material, false representations to Plaintiff and their insurance company related to Plaintiff's treatment including: stating the surgeries were necessary, that Dr. Durrani "could fix" Plaintiff, that more conservative treatment was unnecessary

and futile, that the surgery would be simple or was "no big deal", that Plaintiff would be

walking normally within days after each surgery, that the procedures were medically

necessary and accurately reported on the billing to the insurance company, that the

surgery was successful, and that Plaintiff was medically stable and ready to be

discharged.

71.     Dr. Durrani also concealed the potential use of Infuse/BMP-2 and/or Puregen in

Plaintiff's surgery, as well as other information, when he had a duty to disclose to

Plaintiff his planned use of the same.

72.     These misrepresentations and/or concealments were material to Plaintiff

because they directly induced Plaintiff to undergo her surgery.

73.     Dr. Durrani knew or should have known such representations were false, and/or

made the misrepresentations with utter disregard and recklessness as to their truth that

knowledge of their falsity may be inferred.

74.     Dr. Durrani made the misrepresentations before, during and after the surgery

with the intent of misleading Plaintiff and their insurance company into relying upon

them. Specifically, the misrepresentations were made to induce payment by the insurance

company, without which Dr. Durrani would not have performed the surgery, and to

induce Plaintiff to undergo the surgery without regard to medical necessity and only for

the purpose of receiving payment.

75.     The misrepresentations and/or concealments were made during Plaintiff's office

visits at Dr. Durrani's CAST offices.

76.     Plaintiff was justified in their reliance on the misrepresentations because a patient has a right to trust their doctor and that the facility is overseeing the doctor to ensure the patients of that doctor can trust the facility.

77.     As a direct and proximate result of the aforementioned fraud, Plaintiff did undergo surgery which were paid for in whole or in part by their insurance company, and suffered all damages as requested in the Prayer for Relief.

## COUNT VI: SPOLIATION OF EVIDENCE

78.     Dr. Durrani willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

79.     Dr. Durrani spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

80.     Dr. Durrani's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT VII: LOSS OF CONSORTIUM

81.     At all times relevant, the Plaintiffs were married.

82.     As a result of the wrongful acts and omissions of Dr. Durrani, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

83.     All the aforesaid injuries and damages were caused proximately by the acts and omissions of Dr. Durrani.

## CAST COUNTS:

### COUNT I: VICARIOUS LIABILITY

84.     At all times relevant, Defendant Dr. Durrani was an agent, and/or employee of CAST.

85.     Dr. Durrani is in fact, the owner of CAST.

86.     Defendant Dr. Durrani was performing within the scope of his employment with CAST during the care and treatment of Plaintiff.

87.     Defendant CAST is responsible for harm caused by acts of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

88.     Defendant CAST is vicariously liable for the acts of Defendant Dr. Durrani alleged in this Complaint including all of the counts asserted against Dr. Durrani directly.

89.     As a direct and proximate result of Defendant CAST's acts and omissions, Plaintiff sustained all damages requested in the Prayer for Relief.

### COUNT II: NEGLIGENT HIRING, RETENTION, AND SUPERVISION

90.     CAST provided Dr. Durrani, inter alia, financial support, control, medical facilities, billing and insurance payment support, staff support, medicines, and tangible items for use on patients.

91.     CAST and Dr. Durrani participated in experiments using BMP-2 and/or Puregen bone graft on patients, including Plaintiff, without obtaining proper informed consent thereby causing harm to Plaintiff.

12

92.     CAST breached its duty to Plaintiff, inter alia, by not supervising or controlling

the actions of Dr. Durrani and the doctors, nurses, staff, and those with privileges, during

the medical treatment of Plaintiff at CAST.

93.     The Safe Medical Device Act required entities such as CAST to report serious

injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the

manufacturer; this was never done.

94.     Such disregard for and violations of federal law represents strong evidence that

CAST negligently hired, retained, and supervised Dr. Durrani.

95.     As a direct and proximate result of the acts and omissions herein described,

including but not limited to failure to properly supervise medical treatment by Dr.

Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

### COUNT III: SPOLIATION OF EVIDENCE

96.     CAST, through its agents and employees, willfully altered, destroyed, delayed,

hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records,

paperwork and related evidence.

97.     CAST, through its agents and employees, spoiled evidence with knowledge that

there was pending or probable litigation involving Plaintiff.

98.     CAST's conduct was designed to disrupt Plaintiff's potential and/or actual case,

and did in fact and proximately cause disruption, damages and harm to Plaintiff.

### COUNT IV: FRAUD

99.     Upon information and belief, Plaintiff believes the bills requested by Plaintiff will

indicate that CAST falsely represented that Plaintiff's surgery was appropriately indicated,

performed, and medically necessary in contra-indication of the standard of care.

13

100.    CAST sent out billing to Plaintiff at his home following his surgeries at West Chester Hospital/UC Health.

101.    The exact dates these medical bills were sent out are reflected in those medical bills.

102.    These bills constituted affirmative representations by CAST that the charges related to Plaintiff's surgeries were medically appropriate and properly documented.

103.    The bills were sent with the knowledge of CAST that in fact Plaintiff's surgeries were not appropriately billed and documented and that the services rendered at West Chester Hospital/UC Health associated with Dr. Durrani were not appropriate.

104.    The bills sent by CAST to Plaintiff falsely represented that Plaintiff's surgeries were appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

105.    Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for CAST's services in association with Dr. Durrani's surgery.

106.    As a direct and proximate result of this reliance on the billing of CAST, Plaintiff incurred medical bills that she otherwise would not have incurred.

107.    CAST also either concealed from Plaintiff that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgeries, or misrepresented to Plaintiff the nature of the surgeries, and the particular risks that were involved therein.

108.    CAST's concealments and misrepresentations regarding Infuse/BMP-2 or Puregen and the nature and risks of Plaintiff's surgeries were material facts.

14

109.    Because of its superior position and professional role as a medical service provider, CAST had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

110.    CAST intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgeries, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at West Chester Hospital/UC Health.

111.    Plaintiff was unaware that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgeries and therefore, was unaware of the health risks of Infuse/BMP-2 or Puregen's use in Plaintiff's spine.

112.    Had Plaintiff known before Plaintiff's surgeries that Infuse/BMP-2 or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgery with Dr. Durrani at West Chester Hospital/UC Health.

113.    Plaintiffs are still awaiting itemized billing from WCH/ UC Health reflecting the exact totals charged for the use of BMP-2 on the Plaintiff.

114.    As a direct and proximate result of CAST's concealments and/or misrepresentations regarding Infuse/BMP-2 or Puregen, and the nature of the surgeries performed by Dr. Durrani at West Chester Hospital/UC Health Plaintiff sustained, inter alia, economic, and non-economic (including physical, emotional) damages.

15

## COUNT IV: OHIO CONSUMER SALES PROTECTION ACT

115.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

116.    CAST's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

117.    CAST omitted suppressed and concealed from Plaintiffs facts with the intent that Plaintiffs rely on these omissions, suppressions and concealments as set forth herein.

118.    CAST's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

119.    CAST was fully aware of its actions.

120.    CAST was fully aware that Plaintiffs were induced by and relied upon CAST's representations at the time CAST was engaged by Plaintiffs.

121.    Had Plaintiffs been aware that CAST's representations as set forth above were untrue, Plaintiffs would not have used the services of Defendants.

122.    CAST, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

123.    CAST 's actions were not the result of any bona fide errors.

124.    As a result of CAST's unfair, deceptive and unconscionable acts and practices, Plaintiffs have suffered and continues to suffer damages, which include, but are not limited to the following:

        a.    Loss of money paid

16

    b.  Severe aggravation and inconveniences

    c.  Under O.R.C. 1345.01 Plaintiffs are entitled to:

          i.  An order requiring CAST restore to Plaintiffs all money received from Plaintiffs plus three times actual damages and/or actual/statutory damages for each violation;

          ii.  All incidental and consequential damages incurred by Plaintiffs;

          iii.  All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

## COUNT V: LOSS OF CONSORTIUM

125.    At all times relevant, the Plaintiffs were married.

126.    As a result of the wrongful acts and omissions of CAST, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

127.    All the aforesaid injuries and damages were caused proximately by the acts and omissions of CAST.

## WEST CHESTER HOSPITAL/UC HEALTH COUNTS:

## COUNT I: NEGLIGENCE

128.    West Chester Hospital/UC Health owed their patient, Plaintiff, through its agents and employees the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

129.    West Chester Hospital/UC Health acting through its agents and employees breached their duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or

similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, improper assistance during Plaintiff's surgery(ies) and improper follow up care addressing a patient's concerns.

130.     The agents and employees who deviated from the standard of care include nurses, physician assistants, residents and other hospital personnel who participated in Plaintiff's surgery.

131.     The management, employees, nurses, technicians, agents and all staff during the scope of their employment and/or agency of West Chester Hospital/UC Health's knowledge and approval, either knew or should have known the surgery was not medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the pre-op evaluation and assessment; and the violation of their responsibility under the bylaws, rules, regulations and policies of West Chester Hospital/UC Health.

132.     As a direct and proximate result of the aforementioned negligence and deviation from the standard of care by the agents and employees of West Chester Hospital/UC Health, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT II: NEGLIGENT CREDENTIALING, SUPERVISION, AND RETENTION

133.     As described in the Counts asserted directly against Dr. Durrani, the actions of Dr. Durrani with respect to Plaintiff constitute medical negligence, lack of informed consent, battery, and fraud.

134. West Chester Hospital/UC Health negligently credentialed, supervised, and retained Dr. Durrani as a credentialed physician, violating their bylaws and JCAHO rules by:

      a. Allowing Dr. Durrani to repeatedly violate the West Chester Hospital/UC Health bylaws with it's full knowledge of the same;

      b. Failing to adequately review, look into, and otherwise investigate Dr. Durrani's educational background, work history and peer reviews when he applied for and reapplied for privileges at West Chester Hospital;

      c. Ignoring complaints about Dr. Durrani's treatment of patients reported to it by West Chester Hospital staff, doctors, Dr. Durrani's patients and by others;

      d. Ignoring information they knew or should have known pertaining to Dr. Durrani's previous privileged time at other Cincinnati area hospitals, including Children's Hospital, University Hospital, Deaconess Hospital, Good Samaritan Hospital and Christ Hospital.

135. The Safe Medical Device Act required entities such as West Chester Hospital/UC Health to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

136. As a direct and proximate result of the negligent credentialing, supervision, and retention of Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: FRAUD

137. West Chester Hospital/UC Health sent out billing to Plaintiff at their home following their surgeries at West Chester Hospital.

19

138. The exact dates these medical bills were sent out are reflected in those medical bills.

139. These bills constituted affirmative representations by West Chester Hospital/UC Health that the charges related to Plaintiff's surgery were medically appropriate and properly documented.

140. The bills were sent with the knowledge of West Chester Hospital/UC Health that in fact Plaintiff's surgery was not appropriately billed and documented and that the service rendered at West Chester Hospital/UC Health associated with Dr. Durrani was not appropriate.

141. The bills sent by West Chester Hospital/UC Health to Plaintiff's falsely represented that Plaintiff's surgery was appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

142. Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for West Chester Hospital/UC Health's services in association with Dr. Durrani's surgery(ies).

143. West Chester Hospital/UC Health concealed information they knew about Dr. Durrani, including BMP-2/Puregen, from Plaintiff which if not concealed Plaintiff would not have allowed Dr. Durrani to perform surgery.

144. As a direct and proximate result of the fraud upon Plaintiffs by West Chester Hospital/UC Health, Plaintiff sustained all damages requested in the Prayer for Relief.

145.    West Chester Hospital/UC Health sent out billing to Plaintiff at his home following his surgeries at West Chester Hospital.

146.    The exact dates these medical bills were sent out are reflected in those medical bills.

147.    These bills constituted affirmative representations by West Chester Hospital/UC Health that the charges related to Plaintiff's surgeries were medically appropriate and properly documented.

148.    The bills were sent with the knowledge of West Chester Hospital/UC Health that in fact Plaintiff's surgeries were not appropriately billed and documented and that the services rendered at West Chester Hospital/UC Health associated with Dr. Durrani were not appropriate.

149.    The bills sent by West Chester Hospital/UC Health to Plaintiff falsely represented that Plaintiff's surgeries were appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

150.    Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for West Chester Hospital/UC Health's services in association with Dr. Durrani's surgeries.

151.    As a direct and proximate result of this reliance on the billing of West Chester Hospital/UC Health, Plaintiff incurred medical bills that he otherwise would not have incurred.

152.    West Chester Hospital/UC Health also either concealed from Plaintiff facts they knew about Dr. Durrani, including that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgery, or misrepresented to Plaintiff the nature of the surgery, and the particular risks that were involved therein.

153.    West Chester Hospital/UC Health's concealments and misrepresentations regarding Infuse/BMP-2 or Puregen and the nature and risks of Plaintiff's surgeries were material facts.

154.    Because of its superior position and professional role as a medical service provider, West Chester Hospital/UC Health had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

155.    West Chester Hospital/UC Health intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgery, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at West Chester Hospital/UC Health.

156.    Plaintiff was unaware that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgeries and therefore, was unaware of the health risks of Infuse/BMP-2 or Puregen's use in Plaintiff's spine.

157.    Had Plaintiff known before Plaintiff's surgeries that Infuse/BMP-2 or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgeries with Dr. Durrani at West Chester Hospital/UC Health.

158.    As a direct and proximate result of the fraud upon Plaintiff by West Chester Hospital/UC Health, Plaintiff sustained all damages requested in the prayer for relief.

22

## COUNT IV: OHIO CONSUMER SALES PROTECTION ACT

159.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq.
exempts physicians, a transaction between a hospital and a patient/consumer is not
clearly exempted.

160.    West Chester Hospital/UC Health's services rendered to Plaintiff constitute a
"consumer transaction" as defined in ORC Section 1345.01(A).

161.    West Chester Hospital/UC Health omitted suppressed and concealed from
Plaintiffs facts with the intent that Plaintiffs rely on these omissions, suppressions and
concealments as set forth herein.

162.    West Chester Hospital/UC Health's misrepresentations, and its omissions,
suppressions and concealments of fact, as described above, constituted unfair, deceptive
and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to
Substantive Rules and case law.

163.    West Chester Hospital/UC Health was fully aware of its actions.

164.    West Chester Hospital/UC Health was fully aware that Plaintiffs were induced by
and relied upon West Chester Hospital/UC Health's representations at the time West
Chester Hospital/UC Health was engaged by Plaintiffs.

165.    Had Plaintiffs been aware that West Chester Hospital/UC Health's representations
as set forth above were untrue, Plaintiffs would not have used the services of Defendants.

166.    West Chester Hospital/UC Health, through its agency and employees knowingly
committed the unfair, deceptive and/or unconscionable acts and practices described
above.

23

167. West Chester Hospital/UC Health 's actions were not the result of any bona fide errors.

168. As a result of West Chester Hospital/UC Health's unfair, deceptive and unconscionable acts and practices, Plaintiffs have suffered and continues to suffer damages, which include, but are not limited to the following:

      d.   Loss of money paid

      e.   Severe aggravation and inconveniences

      f.   Under O.R.C. 1345.01 Plaintiffs are entitled to:

            i.   An order requiring West Chester Hospital/UC Health restore to Plaintiffs all money received from Plaintiffs plus three times actual damages and/or actual/statutory damages for each violation;

           ii.   All incidental and consequential damages incurred by Plaintiffs;

          iii.   All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

## COUNT V: SPOLIATION OF EVIDENCE

169. West Chester Hospital/UC Health through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

170. West Chester Hospital/UC Health through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

171. West Chester Hospital/UC Health's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

24

## COUNT V: LOSS OF CONSORTIUM

172.    At all times relevant, the Plaintiffs were married.

173.    As a result of the wrongful acts and omissions of West Chester Hospital/UC Health, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

174.    All the aforesaid injuries and damages were caused proximately by the acts and omissions of West Chester Hospital/UC Health.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request and seek justice in the form and procedure of a jury, verdict and judgment against Defendants on all claims for the following damages:

1.    Past medical bills;

2.    Future medical bills;

3.    Lost income and benefits;

4.    Lost future income and benefits;

5.    Loss of ability to earn income;

6.    Past pain and suffering;

7.    Future pain and suffering;

8.    Plaintiff seeks a finding that their injuries are catastrophic under Ohio Rev. Code §2315.18;

9.    All incidental costs and expenses incurred as a result of their injuries;

10.    The damages to their credit as a result of their injuries;

11.    Loss of consortium;

25

12.     Punitive damages;

13.     Costs;

14.     Attorneys' fees;

15.     Interest;

16.     All property loss;

17.     All other relief to which they are entitled including O.R.C. 1345.01

Based upon 1-17 itemization of damages, the damages sought exceed the minimum

jurisdictional amount of this Court and Plaintiff seeks in excess of $25,000.

Respectfully Submitted,

Matthew Hammer (0092483)
Lindsay Boese (0091307)
*Attorneys for Plaintiff*
5247 Madison Pike
Independence, KY 41051
Phone: 513-729-1999
Fax: 513-381-4084
mhammer@ericdeters.com

## JURY DEMAND

Plaintiffs make a demand for a jury under all claims.

Matthew Hammer (0092483)
Lindsay Boese (0091307

26

## Affidavit of Merit

I, Keith D. Wilkey, M.D., after being duly sworn and cautioned state as follows:

1. I am familiar with the applicable standard of care.

2. I have reviewed all relevant medical records reasonably available about Billy Wolsing concerning the allegations of medical negligence.

3. Based upon my review of this record, my education, my training, and experience, it is my belief, to a reasonable degree of medical certainty that the care provided by the Defendants Dr. Durrani, CAST, West Chester Hospital and UC Health was negligent, and this negligence caused injury to Billy Wolsing *inter alia,* negligent and unnecessary surgery, inaccurate, fraudulent, and/or exaggeration of diagnoses, negligent surgical techniques, failure to maintain accurate and complete surgical records, unnecessary pain management procedures based on fraudulent, inaccurate, and/or exaggeration of medical records, failure to maintain complete and accurate surgical consent forms, negligent selection and implantation of hardware, failure to obtain proper informed consent for use, failure to provide adequate/complete pre and post-operative patient surgical education and monitoring, failure to supervise Dr. Durrani, negligent pre- surgical diagnosis, improper documentation, health care fraud, battery, negligent treatment, practicing outside the scope of training, education, experience, and Board certifications, and medical negligence.

4. Medical/social history: Billy Wolsing *is a now* 37 year old Caucasian male, married with four children living at home, and is currently disabled. He admits to social drinking, smoking one pack per day 20+ years, and denies illicit drug abuse. His prior medical history includes kidney stones. His past psychiatric history includes depression. His prior surgical history includes hand surgery.

5. Billy Wolsing has had an extensive history of recurrent back pain, which spans from childhood to adulthood. On 06/22/09, Billy Wolsing completed a Lumbar Spine MRI at St. Elizabeth Hospital. The MRI revealed five lumbar vertebrae bodies with normal signal height and alignment. Mild discogenic and degenerative changes at L4- L5 and L5-S1 with small central and right central disc protrusions. Mild narrowing of the neural foramina bilaterally, without evidence of significant central canal stenosis.

6. Billy Wolsing attended two consultations(11/14/11, 11/22/11) with Dr. Troy Ashcraft, of Summit Medical Group, his primary care physician for complaints of new back pain. Dr. Ashcraft dictates,"This is a chronic problem. The current episode started more than one year ago. The problem occurs constantly, daily pain. The problem has been gradually worsening. The current episode started today. He has been seen by Dr. Hanson(pain management physician) and Dr. Kelly in the past. He states he has received nerve blocks. Height 5'6", 171 pounds, BMI 27.60 kg. Diagnosis of disk herniation, refer to CAST."

7. **Inaccurate, fraudulent, and/or exaggeration of diagnoses, Failure to maintain accurate and complete surgical records, Failure to maintain a complete and accurate medical record, Failure to properly educate patient regarding diagnoses-** On 12/06/11, Billy Wolsing attended

an initial consultation visit with Dr. Durrani at CAST. Dr. Durrani dictates, "Here for evaluation *regarding lower back pain and radicular pain going down both lower extremities, more marked on* the right as compared to the left. This has been going on for the last three years, but the overall duration of symptoms is the last fourteen years. *The pain is in the lower back, radiates all the way down to the toes, and to the back of the ankles. This is pretty much where it stops. He has* occasional numbness, paresthesias in the toes as well, but most of it is into the back of the calf in the L5 distribution. He has taken anti-inflammatories, muscle relaxants, pain medication, chiropractic care, physical therapy, epidural steroids, and none of them seem to have given him but very temporary relief. The MRI from 2009 was reported which shows that he has lumbar foraminal stenosis at the L4-5 and the L5-S1 level. He also has advanced facet arthropathy as well. New lumbar spine MRI ordered. Very significant functional impairment. In the interim, we are going to start him on pain medication to control his pain."

8. **Inaccurate, fraudulent, and/or exaggeration of diagnoses, Failure to maintain accurate and complete surgical records, Failure to maintain a complete and accurate medical record, Failure to properly educate patient regarding diagnoses**-Additionally on 12/6/11, Mr. Wolsing filled out a numerical rating scale regarding his pain, symptoms, and degree of which back and leg pain impact daily life. Mr. Wolsing was asked to rate his pain on a scale from 0(none)-10(worst), and documents his average low back pain a "4/10", average leg pain/numbness a "3/10", and that standing and walking relieve pain. Mr. Wolsing also filled out a questionnaire asking to indicate the activities that require assistance performing with the following choices: driving, walking, standing, ambulating up/down stairs, lifting, cooking, bathing, using the restroom, dressing, shopping, writing, ambulating, household chores, outdoor yard work, buttoning shirt, or dropping things. Mr. Wolsing selected only three of sixteen choices as being current difficulties, which were lifting, household chores, and outdoor yard work. Dr. Durrani's documentation of "Very significant functional impairment" is a blatant exaggeration.

9. **Unnecessary surgery, Negligent pre- surgical diagnosis, Inaccurate, fraudulent, and/or exaggeration of diagnoses, Failure to maintain accurate and complete surgical records, Failure to maintain a complete and accurate medical record, Failure to properly educate patient regarding diagnoses**- Dr. Durrani should have thoroughly reviewed Billy Wolsing medical records and any conservative approaches that had tried and failed, as well as thoroughly educate the patient regarding reasonable outcomes, importance of physical therapy compliance, *possible compromised healing due to smoking, and narcotic medication education and safety. At* that time, Billy Wolsing had an admitted history of voluntary lack of exercise in years, leading to his weight gain. The conservative treatment assessment performed by Dr. Durrani and CAST staff *fails to meet the standard of care needed before surgical intervention is required.* Dr. Durrani should have opted to start Billy Wolsing with non invasive measures, such as physical therapy and pain management consultation, on a trial basis of 90 days. After these non operative measures were put in place and evaluated on the success/failure trial period, then Dr. Durrani should have moved towards more aggressive treatment, such as surgery.

10. On 12/20/11, Billy Wolsing completed a Lumbar Spine MRI at St. Elizabeth Hospital. The MRI revealed mild multilevel discogenic disease, less prominent at L4-L5 level than on previous study.

Small central disc protrusion seen on previous study at L4-5 with more focal indentation of the thecal sac centrally is not identified on current study. L5-S1 small disc protrusions/herniations again noted with mild indentation of thecal sac.

11. **Inaccurate, fraudulent, and/or exaggeration of diagnoses, failure to properly educate patient regarding diagnoses, Failure to maintain accurate and complete surgical records, Failure to perform accurate and complete preoperative teaching, Failure to maintain complete and accurate surgical consent forms, Fraudulent, negligent and reckless pre operative work up,** On 12/27/11, Billy Wolsing attended a follow up visit with Dr. Durrani at CAST. Dr. Durrani dictated, "The MRI shows at the L4-5, L5-S1 level, there is lumbar disk degeneration with disk herniation at both levels. There is fairly advanced foraminal stenosis bilaterally at L4-5 and L5-S1, which is causing bilateral foraminal stenosis. My recommendation is having failed conservative treatment is to do a lumbar hemilaminectomy, bilateral foraminotomy at L4-5 and L5-S1. We will have those scheduled. Impression of very significant functional impairment, and failure of conservative treatment for over three to four years at this point."

12. **Inaccurate, fraudulent, and/or exaggeration of diagnoses, failure to properly educate patient regarding diagnoses, Failure to maintain accurate and complete surgical records, Failure to perform accurate and complete preoperative teaching, Failure to maintain complete and accurate surgical consent forms, Fraudulent, negligent and reckless pre operative work up, -** On 03/20/12, Billy Wolsing attended a follow up visit with Dr. Durrani at CAST. Dr. Durrani dictated, "We today discussed his upcoming surgery. I feel he understands. We discussed the risks and benefits, pros and cons. I feel overall he completely understands the surgery."

13. **Negligent and unnecessary surgery, Failure to obtain signed West Chester Hospital surgical consent form, Failure to inform patient of additional/changed procedure and reason, Grossly negligent surgical techniques-** On 03/21/12, Dr. Durrani and Billy Wolsing signed a CAST office surgical consent form. The form listed the procedure to be performed as "L4-5, L5-S1 hemilami, F&D". "According to 42 CFR §482.24(c)(2)(v), the statutory authority for regulation of health care facilities accredited by Medicare and Medicaid, all inpatient and outpatient medical records must contain a properly executed and completed written informed-consent form for all procedures and treatments specified by the hospital's medical staff or by state or federal laws or regulations. Any physician with privileges at such facilities must follow the requirements on informed consent for all patients, not just Medicare and Medicaid patients. The physician must provide the patient or legal representative with information about the planned procedure and its risks. The physician should use plain, simple language and avoid "medicalese" or medical terminology". Dr. Durrani and CAST failed to execute a complete and accurate surgical consent form with Billy Wolsing, and this failure caused him harm.

14. **Patient financial loss due to physician ordering of unnecessary, expensive tests and procedures based on inaccurate, fraudulent, and/or exaggeration of diagnoses, Negligent and unnecessary surgery, Failure to inform patient of additional/changed procedure and reason, Grossly negligent surgical techniques, failure to supervise** he scheduling form for West Chester Operating Room faxed over 03/23/12 to WCH from Dr. Durrani's office lists

the diagnoses as "722.10 Herniated Disc Lumbar, 722.52 DDD(Degenerative Disk Disease)-Lumbar, 724.02 Spinal Stenosis-Lumbar 756.12 Spondylolisthesis." The procedure listed(as consent should read) "L4-5, L5-S1 hemilaminectomy with bilateral foraminotomy and decompression 63047, 63048." Dr. Durrani listed the post-op diagnoses in his OR report as "Lumbar spinal stenosis L4-5, Lumbar spinal stenosis L5-S1 right side, Lumbar foraminal stenosis L4-5 and L5-S1 right side, Lumbar radiculopathy L4, L5, and S1, right side." The surgery does not match the diagnosis, and the diagnosis reported in November, and on the scheduling document (03/23/12) do not match the diagnosis on the operating report. The diagnosis was falsely reported on the operative report to justify the surgery as medically necessary, when it was not.

15. **Health care fraud, Battery, Negligent treatment, Practicing outside the scope of training, education, experience, and Board certifications, Medical negligence, Patient financial loss due to physician ordering of unnecessary, expensive tests and procedures based on inaccurate, fraudulent, and/or exaggeration of diagnoses, Negligent and unnecessary surgery, Failure to inform patient of additional/changed procedure and reason, Grossly negligent surgical techniques, failure to supervise** - CPT Code 63047 is to be used for laminectomy and foraminotomy when associated with spinal stenosis, whereas 63030 is to be used for laminectomy associated with a discectomy, sometimes called a hemilaminectomy. A hemilaminectomy is the appropriate treatment for a herniated disk and the treatment scheduled. The treatment reported in the OR report, and the procedure for the billing code listed on the scheduling form, is for spinal stenosis. The hemilaminectomy(63030) listed on the operative report does not justify the billing for a laminectomy (63047), and was not actually performed as evidenced by a lack of change in disk herniation following the surgery.

16. **Health care fraud, Battery, Negligent treatment, Practicing outside the scope of training, education, experience, and Board certifications, Medical negligence, Patient financial loss due to physician ordering of unnecessary, expensive tests and procedures based on inaccurate, fraudulent, and/or exaggeration of diagnoses, Negligent and unnecessary surgery, Failure to obtain signed West Chester Hospital surgical consent form, Failure to inform patient of additional/changed procedure and reason, Grossly negligent surgical techniques, failure to supervise-** On 04/04/12, at UC/West Chester Hospital, Billy Wolsing had surgery completed by Dr. Durrani. The signed consent read "Lumbar 4-5, L5-S1 hemilaminectomy with foraminotomy and decompression" Dr. Durrani lists procedures performed as "Lumbar hemilaminectomy L4-L5, Lumbar hemilaminectomy L5-S1, Lumbar foraminotomy L4-L5 using Baxano, Lumbar foraminotomy and lateral recess decompression right side L5-S1". Dr. Durrani dictated his OR report on the same day.

17. **Negligent and unnecessary surgery, Failure to obtain signed West Chester Hospital surgical consent form, Failure to inform patient of additional/changed procedure and reason, Grossly negligent surgical techniques, failure to supervise -**"According to 42 CFR §482.24(c)(2)(v), the statutory authority for regulation of health care facilities accredited by Medicare and Medicaid, all inpatient and outpatient medical records must contain a properly executed and completed written informed-consent form for all procedures and treatments specified by the hospital's medical staff or by state or federal laws or regulations. Any physician with

privileges at such facilities must follow the requirements on informed consent for all patients, not just Medicare and Medicaid patients. The physician must provide the patient or legal representative with information about the planned procedure and its risks. The physician should use plain, simple language and avoid "medicalese" or medical terminology". Dr. Durrani and WCH failed to execute a complete and accurate surgical consent form with Billy Wolsing, and this failure caused him harm.

18. **Inaccurate, fraudulent, and/or exaggeration of diagnoses, Negligent and unnecessary surgery, Failure to adhere to signed West Chester Hospital surgical consent form, Failure to inform patient of additional/changed procedure and reason, Grossly negligent surgical techniques, negligent selection and implantation of hardware, failure to supervise-** Scheduled case time states 12:45pm. The OR start time is documented as 2:11pm. Dr. Durrani was notoriously well known by WCH staff for arriving late, requiring patients to be anestisticed for longer than necessary because of his tardiness. Dr. Durrani was also known by WCH staff to have several surgeries going at once, and walking between several operating rooms working on patients. WCH/UCH failed to properly supervise Dr. Durrani and the WCH operating room staff, and allowed Dr. Durrani to engage in reckless operating room behavior, and this failure caused harm to Billy Wolsing.

19. **Health care fraud, Battery, Negligent treatment, Practicing outside the scope of training, education, experience, and Board certifications, Medical negligence, Patient financial loss due to physician ordering of unnecessary, expensive tests and procedures based on inaccurate, fraudulent, and/or exaggeration of diagnoses, Negligent and unnecessary surgery, Failure to inform patient of additional/changed procedure and reason, Grossly negligent surgical techniques, failure to supervise Failure to disclose pertinent information,** Decompression non-instrumented surgery was performed by Dr. Durrani at UC/West Chester Hospital using the Baxano Io-Flex system. Four months earlier, on 12/13/11, WKRC in Cincinnati reported that doctors at CAST, including Dr. Durrani, were beginning to use the new Baxano Io-Flex system, reporting the results of one of the first patients to undergo the procedure at CAST, Mr. Ridener. *"So [Mr. Ridener] turned to a team in Blue Ash, using newer technology. That technology is what's knows as the Io-Flex System. Dr. Neal Shanti of CAST or the Center for Advanced Spinal Technologies, is among the first in the tri-state to use it. It's designed to treat what was causing Ridener's pain. A common problem known as spinal stenosis."* Dr. Durrani did not inform Billy Wolsing that he was a novice at the Baxano procedure, that Dr. Durrani had only recently been trained on the procedure, and that he had not performed very many of the procedures with Io-Flex.

20. **Health care fraud, Battery, Negligent treatment, Practicing outside the scope of training, education, experience, and Board certifications, Medical negligence, Patient financial loss due to physician ordering of unnecessary, expensive tests and procedures based on inaccurate, fraudulent, and/or exaggeration of diagnoses, Negligent and unnecessary surgery, Failure to inform patient of additional/changed procedure and reason, Grossly negligent surgical techniques, failure to supervise Negligent use of Baxano system, Improper training, Failure to disclose pertinent information** Billy Wolsing post-operative symptoms are

similar to other patients of Dr. Durrani's that Baxano was used on, patients Jason Romer and Amanda Koch. Dr. Durrani improperly and negligently sheared off too much of their vertebraes using the new Baxano Io-Flex system, forever compromising the structural integrity of their lumbar spine. Dr. Durrani used Baxano (04/04/2012) without having adequate training in the system. Dr. Durrani did not have adequate training and certification to be using the Baxano technique in the operating room. It is our stance that Dr. Durrani learned how to do this procedure during a continuing medical education course, practiced it a few times on a cadaver, and then performed it on live patients. WCH/UCH failed to properly supervise Dr. Durrani, and allowed Dr. Durrani to perform a Baxano procedure, for which he was not adequately trained, and this failure caused harm to Billy Wolsing.

21. **Failure to disclose pertinent information,** Dr. Durrani did not inform Billy Wolsing that Baxano representative, Dave Rattigan, who is also a Medtronic sales representative whom we frequently see in the rhBMP-2 cases, would be present during the surgery to observe the surgery. Mr. Rattigan was also named "2012 Distributor of the Year-Baxano: (See http://www.linkedin.com/pub/david-rattigan/6/82b/111)

22. On 04/17/12, Billy Wolsing attended a follow up visit with Dr. Durrani at CAST. Dr. Durrani dictated, "He is now two weeks status post an L4-5, L5-S1 foraminotomy, decompression bilaterally. He is doing very well at this point. He has minimal pain on the right leg, if any. Start physical therapy." From 04/23/12 to 7/16/12, Billy Wolsing attended physical therapy sessions at NovaCare Rehabilitation.

23. On 07/17/12, Billy Wolsing attended a follow up visit with Dr. Durrani at CAST. Dr. Durrani dictated, "He is doing well from his lumbar surgery. Had some issues with delay in physical therapy, but has done about 20 visits of therapy since then. The wound looks fine. He has good range of motion of the lumbar spine, but is tender over the coccyx area. I today gave him an injection in the coccyx area which actually helped him significantly. My recommendation is for this young man to see his company doctor, and we will at this point allow him to return to work with restrictions. We will discuss his restrictions, and then I will see him back in nine months. In the interim, we are going to start weaning him off the narcotics."

24. On 08/14/12, Billy Wolsing attended a follow up visit with Dr. Durrani at CAST. Dr. Durrani dictated, "He is complaining of significant numbness, paresthesias and burning sensation, as he calls it, both in the back and hips which has been going into both legs. Pretty satisfactory xrays, and has been doing physical therapy. Get new MRI of the lumbar spine."

25. On 08/25/12, Billy Wolsing completed a Lumbar Spine MRI at St. Elizabeth Hospital, ordered by Dr. Durrani for history of back pain radiating to bilateral legs. The MRI revealed normal T12-L1, L1-2, L2-3, L3-4 levels without evidence for bulge or protrusion. Postoperative changes at L4-5 within the posterior soft tissues and there are changes of right laminectomy. No significant disc bulge or protrusion, but loss to the T2 signal intensity within the disc indicating dessication. At L5-S1 level, there is dessication of intervertebral disc manifest by loss of the T2 signal, and broad

based bulge of annulus fibrosus which abuts and mildly deforms the thecal sac. There are facet degenerative changes, but no significant central canal nor neuroforaminal narrowing.

26. On 09/04/12, Billy Wolsing attended a follow up visit with Dr. Durrani at CAST. Dr. Durrani dictated, "Still complaining of a lot of lower back pain and radicular pain and radiculopathy in the L5 distribution bilaterally. He is on Vicodin already. Lumbar spine MRI shows bilateral foraminal stenosis at the L4-5 and the L5-S1 level. It also gives an impression of an L5 pars fracture on the right side. I would like to get a CT scan to either confirm or refute the existence of a pars fracture on the right side at L5. We are going to get him lumbar foraminal injections bilaterally at L4-5 and L5-S1. Prior to that, I am going to increase his Vicodin to 7.5mg."

27. **Inaccurate, fraudulent, and/or exaggeration of diagnoses, Failure to disclose, Failure to maintain a complete and accurate medical record, Failure to properly educate patient regarding diagnoses-**Dr. Durrani indicates a pars fracture at L5 at his 09/04/12 appointment, of which the radiologist did not mention or indicate when interpreting the Lumbar Spine MRI on 08/25/12. Dr. Durrani's interpretations of radiology results often were different in severity than the radiologist.

28. **Grossly negligent surgical techniques, Failure to maintain accurate and complete surgical records, Failure to perform accurate and complete preoperative teaching, Failure to maintain complete and accurate surgical consent forms, Fraudulent, negligent and reckless pre operative work up, Inaccurate, fraudulent, and/or exaggeration of diagnoses, Failure to properly educate patient regarding diagnoses, Intentional infliction of emotional distress due to inaccurate diagnoses and embellished medical statements, Failure to maintain an accurate and complete medical record, Unnecessary pain management procedures based on inaccurate, fraudulent , and/or exaggeration of diagnoses, Patient financial loss due physician ordering of unnecessary, expensive tests and procedures based on inaccurate, fraudulent, and/or exaggeration of diagnoses, Intentional, excessive, and reckless body exposure to radioactive byproducts from unnecessary tests and procedures.** On 10/09/12, Billy Wolsing attended a follow up visit with Dr. Durrani at CAST. Dr. Durrani dictated, "He got the injections at the L4-5 level, got what he said about an hour of pain relief, and then the back started hurting again. He is back at work, really hurting bad. He has been taking his Vicodin 7.5mg four times a day at this point. We reviewed the MRI again that shows the L4-5, L5-S1 lumbar degenerative disk disease with stenosis. The question is which one of these disks is causing him trouble. I would like to do a provocative CT diskogram at L3-4, L4-5, and L5-S1. L3-4 is a control, and the L4-5 and L5-S1 are the disks in question. We will do that test. I am going to add a muscle relaxant to his pain regimen. I told him that if it does not help him, then once he is out of this current script, we will increase it to Vicodin 10mg.

29. Additionally on 10/9/12, Mr. Wolsing filled out another numerical rating scale and questionnaire based on symptoms since surgery. His average low back pain 7/10, average right leg pain/numbness 5/10, average left leg pain/numbness 5/10, severe average general pain every day for most of day, severe pain in back or buttocks, severe pain in legs and feet, moderate numbness/tingling in legs/feet, pain with ambulating around his home and stairs, shopping,

recreational activities, and grocery shopping. When comparing Mr. Wolsing's documented pain scales, his symptoms have dramatically **increased** since the surgery. His "worst levels" before surgery are now his "average levels," six months post surgery.

30. On 12/01/12, Billy Wolsing was evaluated by Dr. Neetu Jose of Liberty Medical Assessments, consulted by the Kentucky Department for Disability Determination. Dr. Jose dictates, "Low back pain with two herniated discs in the lumbar spine, status post surgery in April 2012 for pinched nerve, likely to be chronic in nature. He would benefit from physical therapy, occupational therapy, and for pain management evaluation for better pain control. This is likely to be chronic in nature. With worsening symptoms for his sciatica, he may benefit from medications to help his symptoms with sciatica."

31. Since the surgery by Dr. Durrani, Bill Wolsing has decreased ability to sleep secondary to pain, inability to bend or stoop over, decreased ability to hold weight (thirty pounds max) on the upper extremities bilaterally, currently on pain medications and narcotics, pain symptoms are persistent and affect his quality of life, financial challenges, weight changes secondary to decreased activity level, requires assistance when changing from laying to standing up position, moderate vertigo with position changes, complaint of "burning sensation" when sitting down, inability to actively participate in recreation with children, depressed outlook on life, a feeling of a "screwdriver wedged in back" constantly. His pain has substantially increased in frequency and severity. Since the surgery by these defendants, Mr. Wolsing is now unable to work and had to apply for permanent total disability.

32. WCH/UCH failed to properly supervise Dr. Durrani, and allowed Dr. Durrani to perform unnecessary surgeries and complete procedures with the unauthorized, nonconsensual use of the Baxano system, and this failure caused harm to Billy Wolsing. WCH/UCH staff had knowledge of Dr. Durrani using Baxano in Billy Wolsing's case because of presence in the operating room. WCH/UCH failed to address this activity with Dr. Durrani, and this failure caused harm to Billy Wolsing.

33. The West Chester UC Health employees, nurses, staff and technicians involved in Billy Wolsing's care and surgery knew or should have known about Baxano being used and should have spoken out and stopped Dr. Durrani from using it. Also, based upon information provided to my legal counsel, the nurses "locker room" talked about Dr. Durrani and they knew Dr. Durrani performed unnecessary procedures, used this product, Baxano, and also management knew. The hospital staff and management were negligent in not insuring the proper consent was given prior to surgery. This negligence on the perioperative staff too. In addition, management and administration failed to follow the medical staff bylaws and policies pertaining to the issues I outline here including the supervision of Dr. Durrani.

34. As a result of the negligence, battery, lack of consent and fraud of Dr. Durrani, Billy Wolsing suffered damages which the negligence, battery, lack of consent and fraud proximately caused. These damages include mental and physical pain and suffering, and loss of enjoyment of life, past medical bills and future medical bills.

35. Dr. Durrani made false and material misrepresentations of material facts intended to mislead Billy Wolsing and concealed material facts he had a duty to disclose. West Chester/UC Health and CAST concealed material facts they had a duty to disclose. Billy Wolsing was justified in relying on the misrepresentation and did rely proximately causing harm to Billy Wolsing. Dr. Durrani and West Chester/UC Health, CAST intentionally misled Billy Wolsing. Billy Wolsing had the right to correct information.

36. To a reasonable degree of medical certainty, damages suffered by Billy Wolsing includes aggravation of pre-existing condition; past, present and future pain and suffering; past, present and future loss of enjoyment of life; past and future medical bills, and possible future revision surgery.

37. I will supplement this report based upon the information counsel will provide me including the depositions of the UC/WC Health and CAST representatives.

38. For disclosure purposes, I also attach and adopt Billy Wolsing's Nurse Review.

39. I devote at least one-half of my professional time to the active clinical practice in my field of licensure, or its instruction in an accredited school.

40. Subject to receiving new information, these opinions are subject to amendment.

41. My curriculum vitae is attached.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
Keith D. Wilkey, M.D.

STATE OF _Missouri_  )
COUNTY OF _St. Louis_  )

SUBSCRIBED, SWORN TO, AND ACKNOWLEDGED, before me, a Notary Public, by Keith D. Wilkey, M.D, on the _26_ day of _March_, 2013.

_Angela Kay Poinsett_
Notary Public

My Commission. Expires _07/18/2015_

ANGELA POINSETT
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Charles County
My Commission Expires: July 18, 2015
Commission Number: 11133613

```
                    COURT OF COMMON PLEAS
                    HAMILTON COUNTY, OHIO
```

BILLY WOLSING
    **PLAINTIFF**

                                          Use below number on
                                          all future pleadings

        -- vs --

                                   No.  A 1506693
                                        SUMMONS

ABUBAKAR ATIQ DURRANI M D
    **DEFENDANT**

```
        UC HEALTH
        % GH&R BUSINESS SVCS INC              D - 4
        511 WALNUT STREET
        CINCINNATI OH 45202
```

You are notified
that you have been named Defendant(s) in a complaint filed by

```
        BILLY WOLSING
        3940 WYNNBROOK DR
        APT 38
        FLORENCE KY 41042
```
                                               Plaintiff(s)

in the Hamilton County, COMMON PLEAS CIVIL Division,
**TRACY WINKLER, 1000 MAIN STREET   ROOM 315,**
**CINCINNATI, OH 45202.**
You are hereby summoned and required to serve upon the plaintiff's
attorney, or upon the plaintiff, if he/she has no attorney of record, a
copy of an answer to the complaint within twenty-eight (28) days after
service of this summons on you, exclusive of the day of service. Your
answer must be filed with the Court within three (3) days after the
service of a copy of the answer on the plaintiff's attorney.

Further, pursuant to Local Rule 10 of Hamilton County, you are also required to
file a Notification Form to receive notice of all future hearings.

If you fail to appear and defend, judgement by default will be rendered
against you for the relief demanded in the attached complaint.

```
Name and Address of attorney           TRACY WINKLER
MATT HAMMER                            Clerk, Court of Common Pleas
5247 MADISON PIKE                        Hamilton County, Ohio
INDEPENDENCE        KY
41051
```

                                  By  RICK HOFMANN
                                            Deputy

                                  Date:   December 9, 2015

D112852893

```
                        COURT OF COMMON PLEAS
                        HAMILTON COUNTY, OHIO
```

<u>BILLY WOLSING</u>
    **PLAINTIFF**

                                            Use below number on
                                            all future pleadings

        -- vs --
                                        No.  A 1506693
                                              SUMMONS
<u>ABUBAKAR ATIQ DURRANI M D</u>
    **DEFENDANT**

        WEST CHESTER HOSPITAL LLC
        % GH&R BUSINESS SVCS INC               D - 3
        511 WALNUT STREET
        CINCINNATI OH 45202


You are notified
that you have been named Defendant(s) in a complaint filed by

        BILLY WOLSING
        3940 WYNNBROOK DR
        APT 38
        FLORENCE KY 41042
                                                    Plaintiff(s)
in the Hamilton County, COMMON PLEAS CIVIL Division,
**TRACY WINKLER, 1000 MAIN STREET   ROOM 315,**
**CINCINNATI, OH 45202.**
You are hereby summoned and required to serve upon the plaintiff's
attorney, or upon the plaintiff, if he/she has no attorney of record, a
copy of an answer to the complaint within twenty-eight (28) days after
service of this summons on you, exclusive of the day of service. Your
answer must be filed with the Court within three (3) days after the
service of a copy of the answer on the plaintiff's attorney.

Further, pursuant to Local Rule 10 of Hamilton County, you are also required to
file a Notification Form to receive notice of all future hearings.

If you fail to appear and defend, judgement by default will be rendered
against you for the relief demanded in the attached complaint.


Name and Address of attorney            TRACY WINKLER
MATT HAMMER                             Clerk, Court of Common Pleas
5247 MADISON PIKE                          Hamilton County, Ohio
INDEPENDENCE        KY
41051


                                    By  <u>RICK HOFMANN</u>
                                                    Deputy


                                    Date:   December 9, 2015


D112852874